[Cite as *Smith v. Ohio State Univ.*, 2024-Ohio-5887.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Brooke Smith, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 22AP-125 |
| v. | : | (Ct. of Cl. No. 2020-00321JD) |
| The Ohio State University, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 17, 2024

**On brief:** *Mansour Gavin LPA*, and *Scott D. Simpkins*; *Bursor & Fisher*, *P.A.*, and *Joshua D. Arisohn*, for appellee. **Argued:** *Joshua D. Arisohn.*

**On brief:** *Squire Patton Boggs (US) LLP*, and *John R. Gall*, *Traci L. Martinez, E. Jospeh D'Andrea*, and *Elizabeth P. Helpling*, for appellant. **Argued:** *John. R. Gall.*

APPEAL from the Court of Claims of Ohio

BOGGS, J.

{¶ 1} This appeal is again before this court on remand from the Supreme Court of Ohio, which reversed our decision in *Smith v. Ohio State Univ.*, 10th Dist. No. 22AP-125, 2022-Ohio-4101, and remanded the matter with instructions to determine whether defendant-appellant, The Ohio State University ("OSU"), "is protected by discretionary immunity regarding its decisions in response to the COVID-19 pandemic—namely, to suspend in-person instruction, transition to virtual learning, restrict access to its campus, and provide limited refunds to students." *Smith v. Ohio State Univ.*, ___ Ohio St.3d ___, 2024-Ohio-764, ¶ 1. After reviewing the record and the parties' original and supplemental briefs, we answer the question proposed by the Supreme Court in the affirmative. Pursuant to the Supreme Court's opinion, because OSU is entitled to discretionary immunity, the

Court of Claims lacks jurisdiction over this action filed by plaintiff-appellee, Brooke Smith. Accordingly, we reverse the Court of Claims' judgment certifying this matter as a class action, and we remand the matter to the Court of Claims for dismissal.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} In the spring semester of 2020, Smith was completing her final semester of college in OSU's College of Education and Human Ecology and was enrolled in the last two classes she needed to graduate: a supervised student teaching internship and an in-person seminar that corresponded with her internship. Smith alleges that she paid $23,428 in tuition and fees to OSU for the spring 2020 semester.

{¶ 3} On March 9, 2020, the first day of OSU's scheduled spring break and the same day that Ohio Governor, Mike DeWine, declared a state of emergency as a result of the developing COVID-19 outbreak,[1] OSU President, Michael V. Drake, advised the university community by email that he had convened a task force of senior university leadership and subject-matter experts to focus on the university's response to COVID-19. President Drake announced that, in service of its dual goals of preventing illness and continuing the work of the university, OSU would be suspending face-to-face instruction and transitioning to virtual instruction through at least March 30, 2020. He stated, "I understand that our policy guidelines will cause measurable disruption, but the risk of not acting outweighs the inconvenience of these temporary measures." (McPheron Dep., Ex. 10.)

{¶ 4} Three days later, on March 12, 2020, President Drake again emailed the university community with updates to OSU's COVID-19 response. He emphasized, "[E]very step we take as a university is aimed at reducing any potential spread of the virus and ensuring the continuation of our academic mission." (McPheron Dep., Ex. 12.) He then announced that virtual instruction in lieu of face-to-face instruction would continue through the end of the spring semester, that the university would facilitate a scheduled and orderly process for students to move out of residence halls, and that spring break would be extended for an additional week, through March 22, 2020, to facilitate that process and for faculty and staff to further prepare for virtual instruction. To make up for the extra week

---

[1] The World Heath Organization declared COVID-19 a pandemic on March 11, 2020. https://www.cdc.gov/museum/timeline/covid19.html (accessed Dec. 16, 2024).

of spring break, OSU extended the last day of spring semester classes to April 24, 2020, and amended the dates of final examinations.

{¶ 5} Smith completed the remainder of her coursework through virtual instruction, and she graduated on schedule, on May 3, 2020.

{¶ 6} OSU's academic policy, set out in a publication entitled A Buckeye's Guide to Academic Policies ("Academic Policy"), requires every student to be "financially responsible to [OSU] for payment of all tuition, room and board fees, and related costs added to a student account," including "fees, fines or penalties added to the account which are related to attendance." (Sept. 1, 2021 Def.'s Memo in Opp. to Class Certification, Bricker Aff., Ex. A at 37.) Every student must "agree to [a] Financial Responsibility Statement" before registering for classes each semester. *Id.* The Financial Responsibility Statement sets out the student's agreement to be "financially responsible to [OSU] for payment of all tuition, room and board fees, and related costs that are added to my student account" and sets out the student's "promise to pay any fees, [f]ines or penalties" related to the student's university attendance. (*Id.*, Ex. J.) The Academic Policy describes the fees that may be assessed to a student's account; they include, as relevant here, an instructional fee, general fee, learning technology fee, program fee, course fee, student activity fee, Central Ohio Transit Authority ("COTA") bus fee, recreational sports fee, and student union facility fee. Out-of-state residents, like Smith, and international students also incur a surcharge as compared to students who are Ohio residents.

{¶ 7} On March 16, 2020, OSU announced that it would provide a prorated refund of room and board fees for the spring 2020 semester, although it continued to consider how to calculate those refunds. On or before March 18, 2020, OSU made the decision to issue pro rata refunds of students' recreational sports fees. On March 18, 2020, OSU's Senior Vice President and Chief Financial Officer, Michael Papadakis, informed business officers at other Big Ten universities that OSU did not plan to refund tuition or other fees, although conversations remained ongoing regarding certain fees. OSU did not provide any refunds of students' instructional fees, general fees, learning technology fees, program fees, course fees, student activity fees, COTA fees, student union facility fees, or nonresident surcharges for the spring 2020 semester.

{¶ 8} On May 21, 2020, Smith filed a class action complaint in the Court of Claims against OSU and the Ohio Department of Higher Education, alleging claims for breach of

contract, unjust enrichment, and conversion. Smith filed an amended compliant on May 27, 2020. She later voluntarily dismissed her claims against the Ohio Department of Higher Education and abandoned her conversion claim.

{¶ 9} In her amended complaint, Smith alleges that she and other students entered into binding contracts with OSU "through the admission agreement and payment of tuition and fees," pursuant to which OSU promised to provide certain services, including "in-person educational services," for the entirety of the spring 2020 semester. (May 27, 2020 Am. Compl. at ¶ 39-40.) She alleges that OSU has "not performed under the contract," *id.* at ¶ 41, as upon the closure of its campus, OSU did not "deliver[] the educational services, facilities, access and/or opportunities that [she and other students] contracted and paid for," *id.* at ¶ 6, 22. In particular, she alleges that the "online learning options" that OSU offered students were "subpar in practically every aspect" to the in-person education that students contracted and paid for. *Id.* at ¶ 6. Smith further contends that OSU has retained students' moneys "without providing them the benefit of their bargain," *id.* at ¶ 41, and that students "lost the benefit of the education for which they paid, and/or the services for which their fees paid, without having their tuition and fees refunded to them," *id.* at ¶ 1. She seeks, for herself and members of the putative class, "disgorgement of the pro-rated portion of tuition and fees, proportionate to the amount of time that remained in the Spring Semester 2020 when classes moved online and campus services ceased being provided." *Id.* at ¶ 9, 28.

{¶ 10} After unsuccessfully moving the Court of Claims to dismiss Smith's complaint for failure to state a claim upon which relief could be granted, OSU filed an answer, in which it asserted discretionary immunity as one of many affirmative defenses.

{¶ 11} Smith moved the Court of Claims to certify her case as a class action, pursuant to Civ.R. 23. She sought certification of a class consisting of "[a]ll undergraduate students enrolled in classes at the Columbus campus of [OSU] during the Spring 2020 semester who paid tuition and/or fees." (June 25, 2021 Pl.'s Mot. for Class Certification at 6.) OSU opposed Smith's motion for class certification and filed a motion for summary judgment on the issue of liability, which the Court of Claims did not decide. With respect to class certification, OSU argued that Smith could not meet her burden of demonstrating that certification was appropriate under Civ.R. 23(B)(3) by showing "that the questions of law or fact common to class members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." OSU argued, in part, that Smith failed to establish that common issues of fact exist, let alone predominate, since there is no common, class wide proof of a breach of contract or injury, and because the facts and extent of injury would require individual inquiries as to each student.

{¶ 12} The Court of Claims rejected OSU's arguments and granted Smith's motion, certifying a plaintiff class consisting of "all undergraduate students enrolled in classes at the Columbus campus of [OSU] during the Spring 2020 semester who paid tuition, the general fee, student activity fee, learning technology fee, course fees, program fees, and/or the COTA bus fee."[2] (Jan. 21, 2022 Decision at 4.)

{¶ 13} OSU appealed the Court of Claims' class certification decision to this court, asserting eight assignments of error, most of which challenged the court's analysis under Civ.R. 23. OSU's last assignment of error, however, stated that the Court of Claims erred by certifying a class because the Court of Claims lacked subject-matter jurisdiction over this action, an argument OSU had not made below. Under that assignment of error, OSU argued for the first time, in a single paragraph at the end of its appellate brief, that Smith's claims are barred by discretionary immunity because OSU is an agent or instrumentality of the state, and its decision to transition to virtual instruction and to temporarily close or restrict access to its on-campus facilities in the face of COVID-19 was a basic policy decision characterized by a high degree of official judgment and discretion. OSU argued that because it was entitled to discretionary immunity for its decisions in response to COVID-19, the Court of Claims lacked jurisdiction over Smith's claims.

{¶ 14} This court began its analysis of OSU's appeal with OSU's last assignment of error, reasoning that if we agreed with OSU that the Court of Claims lacked jurisdiction, then OSU's remaining assignments of error would be moot. But we disagreed with OSU's argument that discretionary immunity is a jurisdictional bar to Smith's claims. Instead, we held that discretionary immunity is an affirmative defense, and we declined to decide in the first instance whether OSU was entitled to discretionary immunity. *Smith*, 2022-Ohio-4101, at ¶ 29. Nevertheless, we agreed with OSU that the Court of Claims had failed to

---

[2] The Court of Claims had already certified a class of undergraduate and graduate students who were enrolled at OSU's Columbus campus and who had paid the student union facility fee for the spring 2020 semester, in *McDermott v. Ohio State Univ.*, Ct. of Cl. No. 2020-00286JD. It held that *McDermott* had "staked its claim on the student union fee." (Jan. 21, 2022 Decision at 3-4.)

rigorously analyze the requirements for class certification under Civ.R. 23, and we reversed the Court of Claims' class certification decision.

{¶ 15} OSU appealed our decision regarding discretionary immunity, and the Supreme Court accepted the appeal on a single proposition of law: "The Court of Claims does not have subject[-]matter jurisdiction to hear claims against the State that are subject to discretionary immunity." *Smith*, 2024-Ohio-764, at ¶ 9. In a 4 to 3 decision, the Supreme Court agreed with OSU's proposition of law, holding that "discretionary immunity is a jurisdictional bar, not an affirmative defense, to suits brought against the state in the Court of Claims." *Id.* at ¶ 10. It remanded the matter to this court with instructions "to determine whether [OSU] is immune from suit in the Court of Claims regarding its decisions in response to the COVID-19 pandemic, including to suspend in-person instruction, transition to virtual learning, restrict access to its campus, and provide pro rata refunds to students only for the recreational fee and for room and board." *Id.* at ¶ 20.

{¶ 16} On remand, both parties filed supplemental briefs regarding OSU's entitlement to discretionary immunity.

## II. ANALYSIS

{¶ 17} The Supreme Court has tasked this court with determining whether OSU is immune from suit in the Court of Claims regarding its decisions in response to the COVID-19 pandemic. To do so, we begin by reviewing the doctrine of sovereign immunity, the state's waiver of that immunity, and the limits of the General Assembly's consent for the state to be sued in the Court of Claims.

### A. Sovereign Immunity and its Waiver

{¶ 18} "Under the doctrine of sovereign immunity, 'a state is not subject to suit in its own courts unless it expressly consents to be sued.' " *Smith*, 2024-Ohio-764, at ¶ 12, quoting *Proctor v. Kardassilaris*, 115 Ohio St.3d 71, 2007-Ohio-4838, ¶ 7.

{¶ 19} As amended in 1912, the Ohio Constitution allows "[s]uits [to] be brought against the state, in such courts and in such manner, as may be provided by law." Ohio Constitution, Article I, Section 16. The amendment of Article I, Section 16, of the Ohio Constitution "abolished the defense of governmental immunity," *Krause v. State*, 31 Ohio St.2d 132, 144 (1972), *overruled in part on other grounds*, by *Schenkolewski v. Cleveland Metroparks Sys.*, 67 Ohio St.2d 31 (1981), but it is "not self-executing," *Raudabaugh v. State*, 96 Ohio St. 513, 518 (1917), *overruled in part on other grounds*, by *Schenkolewski*.

The amendment "gave to the General Assembly the authority to determine in what courts and in what manner suits may be brought against the state," and the legislature's consent to suit "is manifest when it designates, by law, the courts and the manner in which such suits may be brought." *Krause* at 144. In *Schenkolewski,* the Supreme Court held that, consistent with Article I, Section 16, of the Ohio Constitution, sovereign immunity can be abolished or altered not only by the General Assembly but also by the judiciary. *Schenkilewski* at paragraph one of the syllabus.

{¶ 20} In 1975, the General Assembly enacted the Court of Claims Act, R.C. 2743.01 et seq., in which it consented to certain suits against the state in the newly created Court of Claims. R.C. 2743.02(A)(1) states, in part: "The state hereby waives its immunity from liability * * * and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties." As used in R.C. Chapter 2743, " '[s]tate' means the state of Ohio, including, but not limited to, the general assembly, the supreme court, the offices of all elected state officers, and all departments, boards, offices, commissions, agencies, institutions, and other instrumentalities of the state." R.C. 2743.01(A). Neither Smith nor OSU disputes that OSU falls within that applicable definition, as an instrumentality of the state.

{¶ 21} The Court of Claims "has exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity" in R.C. 2743.02. R.C. 2743.03(A)(1). The Court of Claims' jurisdiction is therefore tied to the scope of the state's waiver of immunity and consent to be sued in R.C. 2743.02. *Cirino v. Ohio Bur. of Workers' Comp.*, 153 Ohio St.3d 333, 2018-Ohio-2665, ¶ 19.

### B. *Reynolds* and the Recognition of Discretionary Immunity

{¶ 22} Despite the broad language in R.C. 2743.02, "the state's potential liability under R.C. Chapter 2743 is not unbounded." *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, ¶ 34, citing *Reynolds v. State*, 14 Ohio St.3d 68 (1984). In *Reynolds*, the Supreme Court addressed the scope of the General Assembly's consent to suit in R.C. 2743.02 and purportedly relied on the statutory language itself as limiting the abrogation of sovereign immunity, consistent with the Supreme Court's own limited abrogation of municipal immunity in *Haverlack v. Portage Homes, Inc.*, 2 Ohio St.3d 26 (1982), and *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.*, 6 Ohio St.3d 31 (1983). *Reynolds* at 70. The court held:

> The language in R.C. 2743.02 that "the state" shall "have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *" means that the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.

*Id.*[3]

{¶ 23} The Supreme Court has characterized *Reynolds* as "reject[ing] the notion that the General Assembly's abrogation of sovereign immunity in R.C. 2743.02 extended to essential acts of governmental decisionmaking." *Wallace* at ¶ 34. The Court of Claims thus lacks jurisdiction over claims based on the state's "highly discretionary decisions pursuant to its legislative, judicial, executive, or planning functions, *because the state has not waived its sovereign immunity for those decisions*." (Emphasis added.) *Smith*, 2024-Ohio-764, at ¶ 16. The Supreme Court has "adopt[ed] the phrase 'discretionary-function doctrine' as shorthand" for the limitation on the state's consent to be sued, as expressed in *Reynolds*. *Risner v. Ohio Dept. of Transp.*, 145 Ohio St.3d 55, 2015-Ohio-4443, ¶ 12. It more recently referred to that doctrine in *Smith* as simply "discretionary immunity." *Smith*, 2024-Ohio-764, at ¶ 16. Under the doctrine of discretionary immunity, the state "is immune from any liability arising from the decisions made pursuant to its discretionary function." *Risner* at ¶ 24.

{¶ 24} Discretionary immunity does not "extend beyond [the state's] discretionary function to acts of implementation." *Id.* Once the state has made a discretionary policy decision to engage in certain activity, "the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Reynolds*, at paragraph one of the syllabus. Accordingly, "when a suit challenges the manner in which the state implements one of its discretionary decisions," rather than the discretionary decision itself, "the Court of Claims will not be barred from hearing the case." *Smith*, 2024-Ohio-764, at ¶ 17, citing *Risner* at ¶ 23.

---

[3] Smith boldly argues in her supplemental brief that the Supreme Court's decision in *Reynolds* is wrong and "should be overturned." (Supp. Brief of Plaintiff-Appellee at 12.) Of course, as an intermediate appellate court, we are bound to follow the law as set forth by the Supreme Court, and we cannot make a determination that conflicts with a decision from that court that has not been reversed or overruled. *Wagner v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-399, 2013-Ohio-2451, ¶ 102, citing *State v. Rigsbee*, 174 Ohio App.3d 12, 2007-Ohio-6267, ¶ 43 (2d Dist.), and *State v. Croskey*, 10th Dist. No. 09AP-57, 2009-Ohio-4216, ¶ 7.

{¶ 25} To determine whether OSU is entitled to discretionary immunity, we turn to Smith's amended complaint to determine which decisions or actions by OSU she challenges.

### C. Smith's Claims Assert Liability Based on OSU's Decisions to Transition to Online Instruction and Restrict Access to Campus Facilities

{¶ 26} Smith alleges that she and members of the putative class entered into binding contracts with OSU upon the payment of their tuition and fees. This court has previously recognized that, " 'when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.' " *Bleicher v. Univ. of Cincinnati College of Medicine*, 78 Ohio App.3d 302, 308 (10th Dist.1992), quoting *Behrend v. State*, 55 Ohio App.2d 135, 139 (10th Dist.1977). The terms of the contract between a university and its enrolled students are generally found in the university catalog and handbook. *Leiby v. Univ. of Akron*, 10th Dist. No. 05AP-1281, 2006-Ohio-2831, ¶ 15, citing *Embry v. Cent. State Univ.*, 10th Dist. No. 90AP-1302, 1991 Ohio App. LEXIS 4886, *3 (Oct. 8, 1991).

{¶ 27} Smith alleges that OSU promised to provide students with certain services, including "in-person educational services through the end of the Spring Semester." (Am. Compl. at ¶ 40.) She alleges that students fulfilled their end of the bargain by paying tuition and fees, but that OSU breached its contracts with students by failing to provide the contracted-for services. As a result, she alleges that she and members of the putative class "have suffered damage," including "being deprived of the education, experience, and services to which they [had been] promised and for which they ha[d] already paid." *Id.* at ¶ 42. She maintains that members of the putative class are "entitled to a refund of tuition and fees for in-person educational services, facilities, access and/or opportunities that [OSU has] not provided." *Id.* at ¶ 8.

{¶ 28} In her supplemental brief, Smith argues that she is not challenging OSU's decisions to transition to virtual instruction and to limit access to campus facilities, but as set out in the amended complaint, her breach of contract claim expressly challenges those decisions. The alleged breaches by OSU and the source of OSU's alleged contractual liability are OSU's discretionary policy decisions to transition to virtual instruction and to restrict access to campus facilities. It is those decisions that allegedly deprived students of "the education, experiences, and services" OSU had promised them and for which those

students had paid. *Id.* at ¶ 42. In other words, it is those decisions that allegedly denied students the benefit of their bargain.

{¶ **29**} Inasmuch as Smith seeks "reimbursement of * * * tuition, fees, and other expenses that were collected by [OSU] for services that [OSU has] failed to deliver," reimbursement would constitute damages for OSU's alleged breaches of contract by transitioning to virtual instruction and restricting access to campus facilities. *Id.* at ¶ 43. Smith does not allege that OSU's decision not to reimburse students tuition and certain fees for the spring 2020 semester was itself a breach of the contracts between OSU and students. Instead, in her amended complaint, she seeks a pro rata reimbursement of tuition and fees for services that OSU was allegedly contractually obligated to deliver, as damages for OSU's alleged breach of the contracts.

{¶ **30**} Any liability under Smith's unjust enrichment claim would similarly stem directly from those same policy decisions, to transition to virtual instruction and restrict access to campus facilities, by which OSU allegedly failed to provide Smith and members of the putative class the in-person educational services they had paid for. Denial of those services is the foundation upon which Smith constructs her claim that OSU's retention of students' tuition and fee payments is unjust.

{¶ **31**} President Drake acknowledged the vast scope of formulating OSU's response to the rapidly changing public health landscape brought on by COVID-19 in his March 12, 2020 email to the university community: "We have a large student population and global reach that require us to manage the issue while taking a variety of circumstances into consideration." (McPheron Dep., Ex. 12.) Dr. Bruce McPheron, who was at all relevant times OSU's Executive Vice President and Provost, as well as a member of the COVID-19 task force convened by President Drake, testified about the initial "hard decision" to temporarily transition to virtual instruction following spring break:

> The emergence of this pandemic created a lot of uncertainty. Data were scarce, and as we thought about how best to actually ensure the health of our faculty, staff and students while still being able to deliver our university's mission -- which is largely based around education; disseminating information -- this was a way to give ourselves some time to actually learn how best to protect students should we actually return to face-to-face activities.

(McPheron Dep. at 44.) He testified, "the complexity of all the different decisions a place like Ohio State needs to make were on the table and under discussion here," especially given

the uncertainty as to what actions federal, state, and local governments would take in response to COVID-19.[4]  *Id.* at 57.  He explained:

> President Drake was engaged with all of us in leadership and we were trying to make decisions on the suite of options that would allow us to continue to deliver on the mission of the university. And this -- this approach at this particular point in time was the -- the best solution that we could arrive at.

*Id.* at 44.  He stated that the decision to transition all instruction to virtual instruction "was based upon the premise that we were going to continue the semester to its conclusion, and finding * * * the best pathway toward that."  *Id.* at 45.  A decision to instead close the university entirely, "would have disrupted the academic progress of * * * tens of thousands of students" and was unnecessary because OSU "had a way of actually delivering the education that we had indicated students would receive using * * * distance tools."  *Id.* at 136.

{¶ 32} The decisions to transition from in-person to virtual instruction and to temporarily restrict access to campus facilities made by President Drake, with the advice of a task force comprised of university leadership and subject-matter experts, reflected a balancing of the university's policy goals of protecting the health and safety of the university community while continuing to serve the university's educational mission.  We have no trouble concluding that those decisions constituted basic policy decisions, characterized by the exercise of a high degree of official judgment or discretion.

### D. Smith's Claims Do Not Challenge Negligent Implementation of a Discretionary Policy Decision

{¶ 33} In her supplemental brief, Smith argues that OSU's failure to provide students with partial refunds was part of the *implementation* of OSU's policy decision to close its campus and move classes online, for which OSU is not entitled to immunity.  We disagree.  Again, as the claims are framed in the amended complaint, OSU's policy decisions to move classes online and to restrict access to campus facilities are the bases for any liability for breach of contract or unjust enrichment.  But even were we to put that constraint aside and to consider OSU's decisions whether to make pro rata refunds of

---

[4] It is notable that OSU announced its decision to transition classes to solely virtual instruction through the end of the spring semester before the Director of the Ohio Department of Health: (1) ordered, on March 14, 2020, the closure of kindergarten through 12th grade school buildings; (2) prohibited, on March 17, 2020, mass gatherings of 50 or more people and required the closure of indoor athletic and entertainment facilities; and (3) issued, on March 22, 2020, a stay-at-home order.  After March 22, 2020, it was unlawful for students, faculty, or staff to be inside OSU's campus facilities except as permitted by the stay-at-home order.

tuition and fees independently, we cannot conclude that those decisions constituted implementation of the underlying policy decisions to transition to virtual instruction and restrict access to campus facilities.

{¶ 34} In *Reynolds*, the Supreme Court distinguished between a policy decision and implementation of that decision. The plaintiff in *Reynolds* sought damages from the state for injuries she sustained when she was assaulted and raped by an Ohio prisoner who was on a statutorily authorized work furlough. The relevant statute allowed the Ohio Adult Parole Authority ("OAPA") to grant furloughs to "trustworthy prisoners" to participate in approved educational or work-training programs, but it required that furloughed prisoners be confined during any period that they were not working at an approved program. *Reynolds* at 68-69, citing former R.C. 2967.26. The Supreme Court held that a plaintiff could "not maintain an action against the state for its decision to furlough a prisoner," but that once a furlough decision had been made, a plaintiff could maintain an action against the state "for personal injuries proximately caused by the failure to confine the prisoner during non-working hours," which constituted negligence per se in the implementation of the furlough decision. *Id.* at 70. The failure to confine the furloughed prisoner when he was not working on an approved educational or work-training program was not a discretionary decision; the statute that afforded the OAPA discretion to grant a furlough expressly required that the furloughed prisoner be confined while not working on an approved program. The OAPA was negligent per se when, in implementing its decision to furlough the prisoner, it did not comply with the statutory mandate.

{¶ 35} OSU's need to decide whether to partially refund tuition and certain fees for the spring 2020 semester arose because of its decisions to transition to virtual instruction and limit access to campus facilities, but the decisions to offer pro rata refunds of room and board fees and recreational sports fees did not constitute negligent implementation of the underlying decisions regarding instruction and access. To the contrary, the decisions regarding refunds were, themselves, basic policy decisions characterized by the exercise of a high degree of official judgment or discretion as to an executive or planning function, for which the state has not consented to be sued.

{¶ 36} President Drake, with help from members of his cabinet, made the ultimate decision regarding which fees to partially refund for spring semester 2020. Papadakis was a member of the president's cabinet. Dr. McPheron, who was part of the decision-making

process regarding refunds, explained, "There would have been conversations with" Papadakis, and a "recommendation would have been carried to the president." (McPheron Dep. at 150.) Kristine Devine, OSU's Deputy Chief Financial Officer and Vice President for Financial Operations, also participated in conversations concerning which fees should be refunded, based on the purpose and intent of each fee. Devine had conversations with Papadakis (her direct superior), Dr. McPheron, and Dave Wiseley, the Senior Fiscal Officer for Student Life. According to Devine, the focus in determining whether to refund particular fees was on "the intent and purpose for each fee." (Devine Dep. at 77.)

{¶ 37} OSU individually considered each of the fees charged and decided whether to issue refunds "based on the merits of each fee," considering how the decisions to transition to online instruction and to restrict access to campus facilities affected the subject of each fee. *Id.* at 86; *see also* McPheron Dep. at 171 (with respect to refunds, "we went through th[e] whole fee table"). In other words, OSU considered with respect to each fee whether, in light of its move to online classes and restricted access to campus facilities, it was able to continue providing the services supported by the fees. For example, OSU decided to not refund any portion of students' tuition or instructional fees, including nonresident surcharge fees, all of which fund instructional costs, because OSU continued to provide instruction for the remainder of the semester and awarded students credit accordingly. *See* McPheron Dep. at 153-54, 157-58, 168. Similarly, OSU made the policy decision not to refund any portion of students' general fee, which funds non-instructional student services (Academic Policy at 37), because OSU continued to provide such services, at least virtually, throughout the semester. On the other hand, OSU made a policy decision to issue pro rata refunds of room and board fees and recreational sports fees. As to room and board, Papadakis testified that a student's refund was "essentially prorated by the number of days that they were not able to have the services provided for housing or dining." (Papadakis Dep. at 20.) OSU refunded approximately $34 million in room and board fees for the spring 2020 semester. As to the recreational sports fee, Papadakis explained that the fee was refunded on a pro rata basis "because the students couldn't access the services that [the recreational] facilities typically provide." (Papadakis Dep. at 55.)

{¶ 38} Like its decisions to transition to virtual instruction and to restrict access to campus facilities, OSU's decisions regarding fee refunds involved the exercise of a high degree of official discretion and judgment as to an executive or planning function, related

to OSU's fulfillment of its educational mission and its allocation of resources in the face of the existence of a global public health pandemic. *See Wallace*, 2002-Ohio-4210, at ¶ 36 ("the state already enjoys a fair degree of protection from litigious second-guessing of discretionary governmental decisions that necessarily involve difficult choices about how to allocate the state's resources").

{¶ 39} For these reasons, we reject Smith's argument that her claims seeking refunds of tuition and fees for the spring 2020 semester challenge only the implementation of OSU's basic policy decisions. Smith's claims—whether with respect to OSU's decisions to transition to virtual instruction and to restrict access to campus facilities, or with respect to OSU's decisions regarding which fees to refund—challenge OSU's exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion. OSU is therefore entitled to discretionary immunity regarding those decisions.

### E. Application of Discretionary Immunity is not Limited to Tort Claims

{¶ 40} We next address and reject Smith's argument that discretionary immunity does not apply to claims for breach of contract.

{¶ 41} The General Assembly's consent to suits against the state in R.C. 2743.02(A)(1) does not distinguish between claims sounding in tort and claims sounding in contract. It broadly states, "[t]he state hereby waives its immunity from liability * * * and consents to be sued, and have its liability determined, in the court of claims * * * in accordance with the same rules of law applicable to suits between private parties." R.C. 2743.02(A)(1). The statute contains no limitation on the *types* of actions which may be brought against the state; it requires only that the rules applicable to suits between private parties apply to suits against the state. Indeed, there is no question that, by R.C. 2743.02, the state has waived immunity from liability for claims sounding in contract, including claims for breach of an implied contract, and unjust enrichment, as those claims seek monetary relief from the state under legal theories applicable to suits between private parties. *Buerger v. Office of Pub. Defender*, 17 Ohio App.3d 29, 29 (10th Dist.1984) ("the jurisdiction of the Court of Claims extending to all suits against the state as to which sovereign immunity previously attached * * * is not limited to actions founded in tort but applies to all actions, including actions founded in contract"). *See also Cristino v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 13AP-772, 2014-Ohio-1383, ¶ 16 (finding no dispute that

"claims for breach of contract * * * were permitted by the state's waiver of immunity, and [that] the Court of Claims had subject-matter jurisdiction over them"); *Great W. Cas. Co. v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 14AP-524, 2015-Ohio-1555 (Court of Claims had jurisdiction over plaintiff's unjust enrichment claim, which sought money from the state as compensation for a benefit the state received). Further, this court has considered, without controversy, appeals of Court of Claims' decisions that specifically addressed students' breach of contract claims against state universities. *See, e.g., Prince v. Kent State Univ.*, 10th Dist. No. 11AP-493, 2012 Ohio App. LEXIS 896 (Mar. 13, 2012); *Leiby*, 2006-Ohio-2831; *Bleicher*, 78 Ohio App.3d 302; *Behrend*, 55 Ohio App.2d 135.

{¶ 42} We recall that "discretionary immunity" is but shorthand for describing the limits of the General Assembly's consent for the state to be sued, which the Supreme Court inferred from the statutory language in R.C. 2743.02. *See Risner*, 2015-Ohio-4443, at ¶ 12; *Smith*, 2024-Ohio-764, at ¶ 16. Unless that limitation applies, Smith's claims for breach of contract and unjust enrichment may proceed in the Court of Claims.

{¶ 43} In *Reynolds*, the Supreme Court read the statutory language in R.C. 2743.02 that " 'the state' shall 'have its liability determined * * * in accordance with the same rules of law applicable to suits between private parties * * *' " as limiting the waiver of sovereign immunity by withholding consent to be sued for the state's "legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds* at 70, quoting R.C. 2743.02. The *Reynolds* court reasoned that the General Assembly's consent to suits against the state in R.C. 2743.02 was not significantly different from the Supreme Court's own recent abrogation of municipal immunity in *Haverlack*, 2 Ohio St.3d 26, and *Enghauser*, 6 Ohio St.3d 31, superseded by statute as stated in *Sawicki v. Ottawa Hills*, 37 Ohio St.3d 222, 225 (1988).[5] Indeed, it is from *Enghauser*, that the Supreme Court drew the language to exempt the state from liability for "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Enghauser* at paragraph two of the syllabus; *Reynolds* at 70. The Supreme

---

[5] The General Assembly responded to the Supreme Court's decision in *Haverlack, Enghauser*, and *Zents v. Summit Cty. Bd. of Commrs.*, 9 Ohio St.3d 204 (1984), by enacting the Political Subdivision Tort Liability Act, which provided that political subdivisions, including municipalities, would be liable in tort only as set forth in R.C. Chapter 2744. *Butler v. Jordan*, 92 Ohio St.3d 354, 376 (Cook, J., concurring in judgment).

Court emphasized in *Enghauser* that its abrogation of municipal immunity "should not be interpreted as abolishing immunity to those certain acts which go to the essence of governing." *Enghauser* at 35. The focus of the limitation on the consent to be sued in R.C. 2743.02 is not on the type of claim being made, but on the governmental decision being challenged.

{¶ 44} As Smith points out, this court has described discretionary immunity as "preclud[ing] *tort* liability against the state." (Emphasis sic.) *Wassenaar v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 10AP-395, 2010-Ohio-6125, ¶ 16, citing *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-1052, 2010-Ohio-4736, ¶ 16. But our emphasis in *Wassenaar* was intended to distinguish not between types of legal claims—for example, between claims sounding in tort and claims sounding in contract—but instead to distinguish legal claims from the plaintiff's equitable claim for declaratory judgment in that case. We held that "[d]iscretionary immunity does not * * * preclude claims for declaratory relief." *Id.* at ¶ 16, citing *Bradley v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 07AP-506, 2007-Ohio-7150, ¶ 18. That holding is consistent with the Supreme Court's recognition that sovereign immunity has "never barred equitable claims, which have always been cognizable against the state." *Cleveland v. Ohio Bur. of Workers' Comp.*, 159 Ohio St.3d 459, 2020-Ohio-337, ¶ 10. The General Assembly recognized as much in its prescription of the Court of Claims' jurisdiction. Under R.C. 2743.03(A)(1), the Court of Claims has "exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity contained in section 2743.02 of the Revised Code," but R.C. 2743.03 "does not affect, and shall not be construed as affecting, the original jurisdiction of another court of this state to hear and determine a civil action in which the sole relief that the claimant seeks against the state is a declaratory judgment, injunctive relief, or other equitable relief," R.C. 2743.03(A)(2). The justiciability of claims for declaratory judgment, injunctive relief, or other equitable relief against the state was not dependent on the waiver of immunity in R.C. 2743.02, but have always been cognizable.[6]

{¶ 45} Although Smith is correct that questions concerning the application of discretionary immunity have most often arisen in relation to tort claims against the state,

---

[6] If a claimant who files a legal claim that is subject to the exclusive, original jurisdiction of the Court of Claims also files a claim for declaratory judgment, injunction, or other equitable relief against the state that arises out of the same circumstances that gave rise to the legal claim for damages, then the claims for equitable relief must also be filed in the Court of Claims. R.C. 2743.03(A)(2).

she has not identified, nor has this court found, any precedent for holding that the limits on claims against the state described by the discretionary immunity doctrine apply *only* to causes of action sounding in tort. We therefore reject Smith's argument that the doctrine of discretionary immunity does not apply to contract claims that seek to impose liability for the state's exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.

### F. Smith's Constitutional Arguments Lack Merit

{¶ 46} In her supplemental brief, Smith also argues that application of discretionary immunity to this case would violate both the United States and Ohio Constitutions. Specifically, she argues that applying discretionary immunity to her claims against OSU would violate the "takings" provisions of the Fifth Amendment to the United States Constitution ("nor shall private property be taken for public use, without just compensation")[7] and Article I, Section 19 of the Ohio Constitution ("[p]rivate property shall ever be held inviolate"). Smith also argues that applying discretionary immunity here would constitute an unconstitutional impairment of the obligation of contracts, in violation of Article I, Section 10 of the United States Constitution ("[n]o State shall * * * pass any * * * Law impairing the Obligation of Contracts") and Article II, Section 28 of the Ohio Constitution ("[t]he general assembly shall have no power to pass * * * laws impairing the obligation of contracts").

{¶ 47} Smith cites cases from other Ohio appellate districts, which have held that sovereign immunity does not apply to a takings claim. *See, e.g., Nau v. Martins Ferry,* 7th Dist. No. 13 BE 24, 2014-Ohio-2466, ¶ 15, citing *Mortensen v. Butler Cty. Bd. of Commrs.,* 12th Dist. No. CA2008-10-255, 2009-Ohio-1728, ¶ 38. *See also DLX, Inc. v. Kentucky,* 381 F.3d 511, 528 (6th Cir.2004) ("where the Constitution requires a particular remedy, such as through * * * the Takings Clause * * *, the state is required to provide that remedy in its own courts, notwithstanding sovereign immunity"); *First English Evangelical Lutheran Church v. Cty. of Los Angeles,* 482 U.S. 304, 315 (1987) (describing the Fifth Amendment's just compensation clause as self-executing). But even if sovereign or discretionary

---

[7] The Fifth Amendment's prohibition on government takings without just compensation applies to the states through the Fourteenth Amendment to the United States Constitution. *State ex rel. Awms Water Solutions v. Mertz,* 162 Ohio St.3d 400, 2020-Ohio-5482, ¶ 25, citing *Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 239-41 (1897).

immunity would not preclude Smith from maintaining a takings claim for just compensation, Smith's amended complaint does not assert a takings claim against OSU. Instead, she has asserted only claims for common law breach of contract and unjust enrichment.

{¶ 48} In any event, Smith's belated argument that application of discretionary immunity to her breach of contract and unjust enrichment claims against OSU would deprive her of a protected property interest without just compensation, in violation of the United States and Ohio Constitutions, is unpersuasive. Her argument that she has a constitutionally protected property interest in a recovery on her claims against the state would essentially transform any application of sovereign immunity into an unconstitutional taking. As United States Supreme Court Justice John M. Harlan II stated, albeit in dissent, "The very nature of the doctrine of sovereign immunity precludes regarding its interposition as a Fifth Amendment 'taking.' It seems to me that a Court which, having established this immunity, then declares that the Government must pay for exercising it, is effectively negativing it." *Armstrong v. United States*, 364 U.S. 40, 50 (1960) (Harlan, J., dissenting).

{¶ 49} In *Armstrong*, petitioners held valid and enforceable liens under Maine law on materials it had supplied to a contractor that was building boats pursuant to a contract with the United States. Pursuant to its contract with the contractor-shipbuilder, the United States exercised an option to terminate the contract and required the contractor-shipbuilder to transfer title and deliver to the government all completed and uncompleted work, together with all manufacturing materials acquired by the contractor-shipbuilder for building the boats. Petitioners, who had not been paid for their materials at the time of the transfer, claimed that the government's action destroyed their liens by making them unenforceable, because of the government's sovereign immunity against materialmen's liens. The Supreme Court of the United States stated, "[a]fter transfer to the United States the liens were still valid, * * * but they could not be enforced because of the sovereign immunity of the Government and its property from suit." (Internal citation omitted.) *Id.* at 46. Petitioners argued that this destruction of their liens constituted a taking without just compensation in violation of the Fifth Amendment. A majority of the Supreme Court held that the petitioners' right to resort to the specific property (the furnished materials and unfinished boats) for the satisfaction of their claims was a compensable right under the

Fifth Amendment, and that a governmental taking occurred when the appellants' compensable liens were destroyed when the government took title to that property, because the government's property was not subject to suit. *Id.* at 44, 48. Smith's speculative claims against OSU here are different from the established property rights and enforceable liens at issue in *Armstrong*.

{¶ 50} Smith's arguments that, under the contract clauses in the United States and Ohio Constitutions, R.C. 2743.02(A)(1) cannot be used to substantially interfere with OSU's contracts are similarly unpersuasive. Article I, Section 10, of the United States Constitution provides, "No State shall * * * pass any * * * Law impairing the Obligation of Contracts," and Article II, Section 28 of the Ohio Constitution provides, "The general assembly shall have no power to pass * * * laws impairing the obligation of contracts." The text of both clauses focuses on the legislative power to pass laws that will impair existing contractual obligations. Thus, in determining whether there has been a violation of the contract clause, "we first ask whether the change in state law has 'operated as a substantial impairment of a contractual relationship.' " *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992), quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). "This inquiry has three components: whether there is a contractual relationship, whether *a change in law* impairs that contractual relationship, and whether the impairment is substantial." (Emphasis added.) *Id. See also, State ex rel. Horvath v. State Teachers Retirement Bd.*, 83 Ohio St.3d 67, 76 (1998), citing *Gen. Motors Corp.* at 186.

{¶ 51} More than a century ago, the Supreme Court of the United States explained, "[a] contract is an agreement in which a party undertakes to do, or not to do, a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract." *Sturges v. Crowninshield*, 17 U.S. 122, 197 (1819). The " 'laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge and enforcement.' " *Home Bldg. & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429-30 (1934), quoting *Van Hoffman v. Quincy*, 71 U.S. 535, 550 (1867). A contract cannot be unconstitutionally impaired by a law that was in effect at the time of the making of the contract, for that is the law which binds the contract. *McGuire v. Ameritech Servs.*, 253 F.Supp.2d 988, 1006 (S.D.Ohio 2003), citing *Blaisdell*. The only cases Smith cites in

support of her contract-clause argument involved the application of statutory changes to preexisting contracts and are therefore distinguishable from this case. *See U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977); *Trumbull Cty. Bd. of Commrs. v. Warren*, 142 Ohio App.3d 599 (11th Dist.2001).

{¶ 52} As both R.C. 2743.02(A)(1) and the Supreme Court of Ohio's interpretation of that statute as retaining for the state discretionary immunity long predated any contract between OSU and its students for the spring 2020 semester, we conclude that Smith's invocation of the contract clauses in the United States and Ohio Constitutions as precluding application of discretionary immunity lacks merit.

## III. CONCLUSION

{¶ 53} For these reasons, we conclude that OSU is immune from liability on the claims asserted in Smith's amended complaint regarding OSU's decisions in response to the COVID-19 pandemic, including its decisions to suspend in-person instruction, transition to virtual learning, restrict access to campus facilities, and provide pro rata refunds to students only for room and board fees and recreational sports fees. Because OSU is entitled to discretionary immunity, the Court of Claims lacks jurisdiction over this action pursuant to the Supreme Court of Ohio's decision in *Smith*, 2024-Ohio-764. We therefore reverse the Court of Claims' decision certifying a class action and remand this matter to that court with instructions to dismiss this action.

*Judgment reversed*;
*cause remanded.*

BEATTY BLUNT and EDELSTEIN, JJ., concur.