**[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 128.]**

SEMADENI, EXR., APPELLANT, *v.* OHIO DEPARTMENT OF TRANSPORTATION, APPELLEE.

[Cite as *Semadeni v. Ohio Dept. of Transp.*, 1996-Ohio-199.]

*Torts—Negligence—Streets and highways—Death resulting when chunk of concrete thrown from overpass through automobile windshield—Court of Claims—Pursuant to R.C. 2743.02, Ohio Department of Transportation not immune from claims of liability, when.*

(No. 94-2356—Submitted December 13, 1995—Decided March 4, 1996.)

APPEAL from the Court of Appeals for Franklin County, No. 93API10-1434.

———————————

{¶ 1} On March 22, 1990, Pietro B. Semadeni suffered fatal injuries when a six-pound chunk of concrete approximately eight inches in width crashed through the windshield of his automobile and struck him in the head while he was driving on I-71 in Cincinnati. The concrete had been dropped or thrown by an unidentified person or persons from a four-lane overpass bridge (the "Blair Avenue overpass").

{¶ 2} Semadeni's executor, Brigitte R. Semadeni, filed an action in the Court of Claims against appellee, Ohio Department of Transportation ("ODOT") alleging that, in or before 1986, ODOT had adopted a policy which required the Blair Avenue bridge to be equipped with protective fencing. She claimed that Semadeni's injuries and death were the direct and proximate result of ODOT's negligent failure to install protective fencing on the Blair Avenue overpass.

{¶ 3} ODOT admitted that it had, by 1986, adopted a policy regarding the installation of fencing on existing freeway bridges. It further admitted that no fencing had been installed on the Blair Avenue bridge on the date of Semadeni's accident in March 1990. ODOT denied, however, that it had been negligent, and asserted several

defenses, including one it characterized as "the doctrine of discretionary function immunity."

{¶ 4} Evidence shows that in May 1985 ODOT proposed a new policy ("Policy 1005.1") addressing installation of protective fencing on existing bridges, and that, on July 30, 1985, ODOT received Federal Highway Administration approval of the new policy. The purpose of the policy, in part, was to discourage the throwing or dropping of objects from bridges onto lower roadways and other property. Included in Policy 1005.1 was a table which established a system for calculating an index number for bridges in Ohio based on ten identified criteria, *e.g.,* whether the overpass is unlighted, whether it had previously been the site of a falling object, or whether it passed over property with high vehicular or pedestrian traffic or damage-sensitive property. The policy established that "[a] total index number of 10 or more shall be considered sufficient justification for the installation of protective fencing" but that "retrofitting of bridges which qualify according to the total index number is not mandatory if adequate justification for not doing so can be furnished."

{¶ 5} A year later, on August 12, 1986, Wayne H. Kauble, Chief Engineer of Planning and Design for ODOT, took the first step to implement Policy 1005.1 by notifying ODOT's district deputy directors located throughout the state of its adoption. Coincidentally, on September 1, 1986, two young women were raped and murdered in Akron after the murderers forced their car off the road by throwing concrete from an interstate bridge (the "Stoner Street bridge").[1]

{¶ 6} On September 8, 1986, the acting district planning engineer for ODOT district eight, which included the city of Cincinnati, asked city officials to score its bridges pursuant to the criteria of Policy 1005.1. When, in response, the city of Cincinnati returned its list of scored bridges to ODOT in November 1986, its cover letter informed ODOT that the city had received "numerous complaints from citizens

---

1. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895.

and police concerning objects being thrown from overpasses onto the Interstate Highways below." Moreover, an interoffice communication between two ODOT district eight employees in November 1986 demonstrated awareness on their part that "the City of Cincinnati wants to proceed with this program in their area as quickly as possible" indicating that "[t]here should be no problem with this." Working independently, both ODOT and Cincinnati scored the Blair Avenue overpass with twelve index points.

{¶ 7} On December 16, 1986, Kauble notified district deputy directors throughout the state that retrofitting of bridges should not be postponed to coincide with other planned bridge repair work, as to do so would "not [be] a suitable response to the growing public concern and the prolifteration [sic] of incidents involving objects being thrown from overpasses." Kauble advised the deputy directors that a "positive program with visible results [is needed] to adequately deal with this very real problem."

{¶ 8} On January 15, 1987, the district eight deputy director advised ODOT's central office in Columbus of all bridges located in the district, including the Blair Avenue overpass, which scored ten or more Policy 1005.1 index points. Ultimately, a total of four hundred sixty-one bridges throughout Ohio were identified as scoring ten or more index points pursuant to ODOT's 1985 Policy 1005.1 criteria.

{¶ 9} A year later, in January 1988, ODOT established its initial funding program for fencing bridges in Ohio. The program established funding for forty-four bridges throughout Ohio, representing ten per cent of the total number of bridges required to be fenced by Policy 1005.1. All of the forty-four bridges either scored more than twenty Policy 1005.1 index points, or were located in the immediate vicinity of a bridge with more than twenty index points, with one exception: the Stoner Street bridge, site of the Akron murder incident, was included in the funding program. That bridge, like the Blair Avenue overpass, was rated at twelve points. The Blair Avenue overpass was not approved for funding.

**{¶ 10}** By the date of Semadeni's accident on March 22, 1990 (two years after formulation of the initial funding program, and nearly five years from the date Policy 1005.1 had been adopted), ODOT had, however, entered into contracts for only two projects that were solely for the purpose of retrofitting existing bridges with protective fencing. Construction had not yet begun on one of the two projects. Of the two retrofitting projects, one involved installation of fencing on six bridges in the Akron area (including the Stoner Street bridge) and the second involved construction of protective fencing on five bridges in the Youngstown area.

**{¶ 11}** After Semadeni's death, Kauble advised district eight that the Department had determined that the bridge fencing program should be "accelerated." District eight was instructed to install fences within its district on all bridges that scored ten or more index points and to do so within eight months. The installation of protective fencing on the Blair Avenue overpass was completed on March 26, 1992, over six years after the adoption of Policy 1005.1.

**{¶ 12}** Following trial solely on issues pertaining to liability, the court rendered judgment in favor of ODOT. The court held that ODOT is not liable for the criminal misconduct of third parties, and does not have a duty to provide protection against criminal misconduct. The court further held that ODOT's "decisions regarding the need for and prioritizing of fences was [sic] discretionary in nature and afforded immunity to the state." The court further held that "ODOT was not unreasonable in the amount of time expended in determining when and how protective fencing would be installed on the appropriate overpasses."

**{¶ 13}** The court of appeals, in a split decision, affirmed the judgment entered in favor of ODOT.

**{¶ 14}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Dinsmore & Shohl, Mark A. Vander Laan, Joel S. Taylor* and *David K. Mullen*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Teri Jo Finfrock*, Assistant Attorney General, for appellee.

————————————

**MOYER, C.J.**

{¶ **15**} In 1975 the state of Ohio enacted R.C. 2743.02, which provides, with certain exceptions not relevant herein, that "[t]he state hereby waives its immunity from liability and consents to be sued, and have its liability determined, *** in accordance with the same rules of law applicable to suits between private parties ***." R.C. 2743.02(A)(1).

{¶ **16**} We have previously recognized that imposition of tort liability upon a private bridge contractor may be justified when damage is caused by third parties who have dropped objects from bridges under the contractor's control. In *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 543 N.E.2d 769, the plaintiff alleged negligence on the part of a private bridge contractor in failing to adopt adequate measures to prevent the dropping of objects from a bridge it was repairing, and which had been the site of similar past incidents. The vandalism caused damage to the property of the plaintiff located below the bridge. We concluded that the trial court erred in directing a verdict in favor of the bridge contractor, holding in the syllabus that "[i]f a person exercises control over real or personal property and such person is aware that the property is subject to repeated third-party vandalism, causing injury to or affecting parties off the controller's premises, then a special duty may arise, to those parties whose injuries are reasonably foreseeable, to take adequate measures under the circumstances to prevent future vandalism."

{¶ **17**} We find *Ruhlin* to be factually analogous to the case at bar. In light of ODOT's adoption of Policy 1005.1, and applying "the same rules of law applicable to suits between private parties" to the facts before us, we conclude that ODOT possessed

a duty to foreseeable travelers such as Semadeni to take adequate measures to timely implement Policy 1005.1. The Court of Claims, however, accepted the state's contentions that ODOT was immune from liability for Semadeni's death pursuant to *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E. 2d 776, and its progeny, *e.g.*, *Garland v. Ohio Dept. of Transp.* (1990), 48 Ohio St.3d 10, 548 N.E.2d 233; *Anderson v. Ohio Dept. of Ins.* (1991), 58 Ohio St. 3d 215, 569 N.E.2d 1042.

{¶ 18} In *Reynolds* we held that the state's consent to be sued pursuant to R.C. 2743.02 in accordance with the rules of law applicable to suits between private parties preserved the state's immunity "for its legislative or judicial functions, or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Id.* at paragraph one of the syllabus. Those functions are not engaged in by private parties. We recognized, however, that once such a basic policy decision has been made, and the state has determined to engage in a certain activity or function, "the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities." *Id.*

{¶ 19} In *Garland* we reaffirmed *Reynolds* and further held that "[o]nce a governmental entity has made a discretionary decision, it has a reasonable amount of time to implement that decision without incurring tort liability." *Id.* at paragraph two of the syllabus.

{¶ 20} In *Anderson* we held in paragraph one of the syllabus that "[w]hen carrying out the mandates of a public employer, the actions of the agents or employees of that employer are distinguishable from the original decision to take action and thus could be actionable." We there rejected the state's argument that decisions as to the *manner* in which a basic policy decision is implemented fall within the scope of the state's reserved sovereign immunity, even if implementation decisions require state employees to exercise some degree of discretion. *Anderson*, 58 Ohio St.3d at 217-218, 569 N.E.2d at 1044-1045.

6

**{¶ 21}** Applying this precedent we find that adoption of Policy 1005.1 in 1985 was a "basic policy decision," and that ODOT failed to implement Policy 1005.1 within a reasonable amount of time. The Court of Claims erred in its legal conclusion that subsequent "time and manner" decisions made to implement Policy 1005.1 were themselves entitled to immunity.

**{¶ 22}** When it adopted Policy 1005.1 ODOT determined that the installation of protective fencing was mandatory for all existing bridges in Ohio which scored ten index points or more according to criteria established within the policy, unless "adequate justification for not doing so [could] be furnished." The policy became effective in July 1985 when it received federal approval. The evidence was uncontroverted that the Blair Avenue overpass at all relevant times justified a score in excess of ten points. However, on the date of Semadeni's accidents, nearly five years later, no fencing had yet been installed on the Blair Avenue bridge.

**{¶ 23}** It is clear that ODOT recognized dangers to the traveling public as early as May 1985 when it transmitted Policy 1005.1 to the Federal Highway Administration for approval, and that ODOT was aware in 1985 and 1986 that incidents of debris being dropped from freeway bridges were occurring throughout the state. As early as December 1986, ODOT's chief engineer characterized the dropping of objects from bridges onto interstates as a "very real problem." ODOT was informed in November 1986 that the city of Cincinnati had received "numerous complaints from citizens and police concerning objects being thrown from overpasses onto the Interstate Highways below." In 1986, ODOT officials acknowledged Cincinnati's concern that fencing on its interstate bridges be implemented quickly. At least as early as January 1988 ODOT was aware of the Akron incident in which two women had been raped and murdered in connection with a dropped object incident.

**{¶ 24}** The record discloses, however, no attempt on the part of ODOT to implement Policy 1005.1 for over a year from the date the policy became effective in 1985. ODOT failed to even notify its district deputy directors located throughout the

state of the adoption of Policy 1005.1 until August 12, 1986. Despite clear expressions of concern by both Cincinnati and ODOT officials about the problem of dropped objects, it was not until January 1988, well over two years from the time Policy 1005.1 was adopted and approved, that ODOT established funding for any protective fencing anywhere in the state. Even then, the program established funding for only ten per cent of the qualifying bridges in Ohio. The Blair Avenue overpass was one of more than four hundred bridges scoring ten index points or more which were not approved for funding.

{¶ 25} The Blair Avenue bridge justified a score of twelve index points by ODOT'S own criteria, and pursuant to Policy 1005.1, ODOT's agents and employees were under a mandatory duty to complete its fencing within a reasonable time. In a nearly five-year period, ODOT fenced only a small minority of the bridges which it had itself deemed to be in mandatory need of fencing, including the Blair Avenue overpass. Failure to timely implement Policy 1005.1 as to bridges highest in priority undoubtedly resulted in even greater delay in fencing bridges further down the list of priority, such as the Blair Avenue bridge.

{¶ 26} We hold that, pursuant to R.C. 2743.02, ODOT is not immune from plaintiff's claims of liability. We conclude on this record that reasonable minds could only find that ODOT was negligent in failing to timely implement Policy 1005.1, and that its negligence was a proximate cause of Pietro Semadeni's death. We therefore remand this case to the Court of Claims for it to determine the amount of damages to be awarded Semadeni's estate.

*Judgment reversed*
*and cause remanded.*

RESNICK, F.E. SWEENEY and PFEIFER, JJ., concur

DOUGLAS, J., concurs in judgment only.

WRIGHT and COOK, JJ., dissent.

_____

**Cook, J., dissenting.**

{¶ 27} I respectfully dissent from the majority decision because I would find that ODOT is not liable.

{¶ 28} A state is immune for "the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State* (1984), 14 Ohio St.3d 68, 14 OBR 506, 471 N.E.2d 776, paragraph one of the syllabus. Once such a discretionary decision is made, however, the agency must implement its decision within a "reasonable amount of time" or it may be subject to tort liability. *Garland v. Ohio Dept. of Transp.* (1990), 48 Ohio St.3d 10, 548 N.E.2d 233, paragraph two of the syllabus.

{¶ 29} In *Garland*, we extended the state's immunity beyond the discretionary decision to install a traffic light at a busy intersection to the decision regarding the type of traffic signal to install. Id. at paragraph one of the syllabus. The court recognized that discretionary decision-making also included the timing of an installation and decisions as to funding the installation of the traffic light.

{¶ 30} As in *Garland*, ODOT's decision-making process in this case extended from the decision to install protective fences statewide, to the determination of which bridges needed to be fenced, when they needed to be fenced and how the project would be funded. ODOT's decisions required ODOT not only to prioritize the protective fence program but also to coordinate the fence project with other highway safety projects, such as road resurfacing, traffic signals, intersection improvements, bridge replacements and new highway construction. Making these decisions was part of the executive planning stages of Policy 1005.1, for which ODOT was immune from liability.

{¶ 31} Without the benefit of expert testimony on the magnitude of ODOT's undertaking of this as well as other ODOT projects at the relevant time and without following or adopting any defined standard of "reasonableness," the

majority determines that ODOT was negligent in implementing its policy and subject to liability. The majority measures the reasonableness of ODOT's actions from July 1985, when the policy received Federal Highway Administration approval and concludes that the time from federal approval until the accident was an unreasonable period in which to implement Policy 1005.1. However, in January 1988, ODOT made its final discretionary decision—the initial funding for forty-four bridges. From that time ODOT was subject to liability if it did not implement the policy within a reasonable period.

{¶ 32} In *Garland*, this court determined that fourteen months was a reasonable period of time to implement the installation of a single traffic light at a single intersection. 48 Ohio St.3d at 12, 548 N.E.2d at 235. Here, unlike in *Garland*, ODOT sought to install protective fencing on hundreds of bridges throughout the state. The undertaking involved multiple steps, several districts, millions of dollars, and numerous decisions which could, and did, take several years. Semadeni's accident occurred roughly two years after the initial funding decision. If fourteen months has been found to be a reasonable time, as a matter of law, to implement the installation of a single traffic light, then two years should be a reasonable period of time in which to implement a policy to fence more than four hundred bridges across the state at a cost of $26 million.

{¶ 33} Even if ODOT did not implement its policy decision within a reasonable amount of time, there is a further legal step before the state may be found liable. A state is not subject to tort liability unless the state or agency owed a special duty to plaintiff that is separate and distinct from the duty the agency owed to members of the general public. *Anderson v. Ohio Dept. of Ins.* (1991), 58 Ohio St.3d 215, 218, 569 N.E.2d 1042, 1045; *Sawicki v. Ottawa Hills* (1988), 37 Ohio St.3d 222, 525 N.E.2d 468. The majority does not consider whether ODOT had a special duty to Mr. Semadeni. If there is no special duty to Mr. Semadeni, then ODOT is not liable to him for breach of its duty to the general public.

**{¶ 34}** Four elements must be proven in order to establish the existence of a special duty: (1) the state must assume an affirmative duty to act on behalf of the injured party; (2) the state must be aware that its inaction would lead to the alleged harm; (3) there must be direct contact between the state and the injured party; and (4) the injured party must justifiably rely upon the state's affirmatively undertaking its promised form of relief. *Anderson*, 58 Ohio St.3d at 219, 569 N.E.2d at 1045. Upon review of the record, I would find that ODOT owed a general duty to the public, rather than a special duty to Mr. Semadeni, to take measures to prevent vandalism on highway bridges.

**{¶ 35}** The majority relies on *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.* (1989), 45 Ohio St.3d 171, 543 N.E.2d 769, to find that ODOT owed a special duty to Semadeni take adequate measures to prevent vandalism. In Ruhlin we held that a construction company, repairing a single bridge that had been the site of repeated vandalism, owed a special duty to the property owner located near the bridge. In contrast, ODOT was responsible for more than four hundred bridges that needed to be fenced. Furthermore, the majority does not cite any facts which indicate that ODOT was aware that the Blair Avenue bridge was the subject of repeated vandalism. Rather, the majority relies on the fact that ODOT knew vandalism on bridges was a state-wide problem, knew Cincinnati considered vandalism from bridges a serious problem and knew of the Akron incident. None of these facts indicates that ODOT had notice that the Blair Avenue bridge was the subject of repeated vandalism.

**{¶ 36}** For these reasons, I would find that ODOT was not subject to liability and would affirm the judgment of the court of appeals.

WRIGHT, J., concurs in the foregoing dissenting opinion.

_____