[Cite as *Wilkes v. Ohio Dept. of Transp.*, 2025-Ohio-1030.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Patricia D. Wilkes, as Personal Representative of the Estate of Marquise Shawndell Byrd, | : | |
| | : | No. 24AP-106 |
| Plaintiff-Appellant, | : | (Ct. of Cl. No. 2019-00012JD) |
| v. | : | |
| | : | (ACCELERATED CALENDAR) |
| The Ohio Department of Transportation Jerry Wray, ODOT Director, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on March 25, 2025

**On brief:** *Wilder Legal Group PLC*, and *Marvin D. Wilder*; *Legal Warriors, PLLC*, and *Lillian F. Diallo*; *Breen Law, LLC*, and *John E. Breen*, for appellant. **Argued:** *Marvin D. Wilder*.

**On brief:** *Dave Yost*, Attorney General, *William C. Becker*, and *Lauren D. Emery*, for appellee. **Argued:** *William C. Becker*.

APPEAL from the Court of Claims of Ohio

JAMISON, P.J.

{¶ 1} Plaintiff-appellant, Patricia D. Wilkes, as personal representative of the Estate of Marquise Shawndell Byrd, appeals a judgment of the Court of Claims of Ohio in favor of defendant-appellee, the Ohio Department of Transportation ("ODOT"). For the following reasons, we reverse that judgment and remand this case for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} At approximately 10:00 p.m. on December 19, 2017, A.S. was driving her 2017 Hyundai Elantra on southbound I-75 through Toledo, Ohio. A.S. heard a loud

crashing noise and her vehicle filled with dust and dirt. A.S. looked over at her front-seat passenger, Marquis Byrd, and saw he was not conscious or breathing. A.S. pulled her vehicle to the side of the highway, called 9-1-1, and began CPR on Byrd. Emergency medical services arrived at the scene and immediately transported Byrd to a nearby hospital.

{¶ 3} Toledo Police Officer Jonathan Curtis also responded to A.S.'s 9-1-1 call. Officer Curtis observed a large hole in the passenger side of the windshield of A.S.'s vehicle. Additionally, Officer Curtis saw a burst sandbag on the rear seat immediately behind Byrd. Officer Curtis reconnoitered the area around A.S.'s vehicle and found a second sandbag on the right shoulder of southbound I-75. The second sandbag was approximately 475 feet north—or behind—A.S.'s vehicle, and underneath the Indiana Avenue bridge, which passed over I-75.

{¶ 4} Traffic exiting I-75 South via the Washington Street exit must bear left (east) and pass over I-75 on the Indiana Avenue bridge. The Washington Street exit is the primary exit southbound I-75 motorists use to access downtown Toledo.

{¶ 5} At the time of this incident, the Indiana Avenue bridge was undergoing renovation. ODOT intended to widen I-75, and to accomplish this, ODOT needed to demolish the Indiana Avenue bridge and replace it with a new bridge. ODOT decided to do this in two phases. In the first phase, ODOT planned to tear down the north half of the bridge and rebuild it. ODOT intended to retain the south half of the existing bridge to allow motorists to continue to use the Washington Street exit and Indiana Avenue bridge to access downtown Toledo. In the second phase, ODOT planned to move traffic over to the newly built section, demolish the south half of the existing bridge, and rebuild that half. ODOT retained Kokosing Construction Co., Inc. ("Kokosing") to complete this project.

{¶ 6} Kokosing began work on the Indiana Avenue bridge project on August 21, 2017. Prior to construction, the Indiana Avenue bridge had sidewalks and vandal protective fencing on both the north and south sides of the bridge. According to ODOT policy adopted in July 2016, "[f]encing shall be installed on all bridges over vehicular traffic except as noted" in section 305.2 of the Bridge Design Manual. (Pl.'s Ex. 30 at § 305.2.) Section 305.2 requires fencing if an interstate, like I-75, is under a bridge. The Bridge Design Manual states that "[t]he primary purposes of protective fencing are to provide for the

security of pedestrians and to discourage the throwing or dropping of objects from bridges onto traffic below." *Id.* at § 305.1.

{¶ 7} By December 19, 2017, Kokosing had removed the decking and beams from the north half of the Indiana Avenue bridge. In doing so, Kokosing had eliminated the sidewalk and vandal protective fencing from the north side of the bridge. The remaining bridge consisted of the south-side sidewalk and vandal protective fencing, and one lane for vehicular traffic. Thirty-two-inch-high concrete barriers delineated the north edge of the single lane of traffic. The north side of the bridge was closed to pedestrian traffic, as indicated by signs on both ends of the bridge stating, "Sidewalk Closed Use Other Side." (Pl.'s Ex. 19.)

{¶ 8} Given the circumstances surrounding Byrd's injuries, the Toledo Police Department suspected someone had thrown or dropped a sandbag from the Indiana Avenue bridge onto A.S.'s vehicle. Two Toledo police officers were dispatched to the bridge to look for suspects. At the bridge, the officers observed black sandbags anchoring temporary signs. They spoke to an employee of a business located next to the bridge. The employee said that he had seen a group of black male teenagers walking westbound across the Indiana Avenue bridge earlier that night. As the officers spoke with the employee, the same group appeared walking eastbound across the bridge. The officers stopped the group of four boys and spoke with them. According to the boys, they had crossed the bridge to visit a convenience store. They said another boy had briefly joined them as they were walking to the convenience store, and that boy had thrown a sandbag over the bridge before fleeing. The officers detained all four boys.

{¶ 9} Upon further questioning of the four boys, the story that a fifth boy had thrown the sandbag fell apart. The boys admitted to throwing rocks over the side of the bridge. One of them then took a sandbag from the construction site and threw it onto the highway. The boys heard the sandbag hit A.S.'s vehicle, and they ran away. Ultimately, all four boys were adjudicated delinquent for various felonies as a result of their actions.

{¶ 10} Byrd died from the injuries he sustained when the sandbag struck him. On January 7, 2019, Wilkes—Byrd's mother and the personal representative of Byrd's estate—filed suit against ODOT, alleging a claim for wrongful death based on negligence.

{¶ 11} The parties adduced the evidence set forth above in a bench trial. After hearing and considering all the evidence, the Court of Claims issued a decision finding that Wilkes had failed to prove every element of her claim. In a judgment issued January 12, 2024, the Court of Claims entered judgment for ODOT.

## II. ASSIGNMENT OF ERROR

{¶ 12} Wilkes now appeals the January 12, 2024 judgment, and she assigns the following error for our review:

> The trial court erroneously determined that Plaintiff failed to present evidence from which the Court could conclude that an exception to the general rule of no liability for criminal actions of third parties had been established, or that the totality of the circumstances were "somewhat overwhelming" in order to hold Defendant liable for the criminal actions of third parties.

## III. STANDARD OF REVIEW

{¶ 13} An appellate court reviews a challenge to the factual findings underlying a trial court's judgment following a bench trial under the manifest-weight-of-the-evidence standard. *Elevation Ents. Ltd., v. NMRD Ltd.*, 2023-Ohio-4433, ¶ 18 (10th Dist.); *Jenkins v. Dragoo & Assocs., Inc.*, 2023-Ohio-4103, ¶ 14 (10th Dist.). When applying the manifest-weight standard, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17. In weighing the evidence, a court of appeals "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment .' " (Internal quotation marks deleted and citation omitted.) *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984). Nevertheless, "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *State v. Jordan*, 2023-Ohio-3800, ¶ 17.

{¶ 14} Appellate courts do not review issues of law with the same deference accorded determinations of fact. "[C]ourts apply a de novo standard when reviewing issues of law." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38. Using the de novo standard, "an appellate

court may properly substitute its judgment for that of the trial court . . . ." (Ellipses in original; further quotation marks deleted and citations omitted.) *Hild v. Samaritan Health Partners*, 2024-Ohio-3338, ¶ 16. De novo review, consequently, is not deferential at all. *TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 2022-Ohio-4677, ¶ 38; *accord Elevation Ents., Ltd.* at ¶ 19 (" 'De novo' review means the court of appeals provides an independent review of the record and affords no deference to the trial court's decision.").

## IV.  LEGAL ANALYSIS
### A. ODOT's Motion to Dismiss

{¶ 15} Before we address the merits of this appeal, we must consider an argument raised in ODOT's motion to dismiss. ODOT moved to dismiss on three grounds (1) Wilkes did not timely file her appellant's brief, (2) Wilkes failed to file a trial transcript or an App.R. 9(B)(5) statement, and (3) Wilkes failed to file a proper notice of appeal. Prior to oral argument, this court issued entries resolving the first two grounds for dismissal in Wilkes' favor. *See* May 2, 2024 Journal Entry (reinstating the appeal because Wilkes' counsel was not receiving mailings from the clerk of court); May 20, 2024 Journal Entry (refusing to strike the amended record, which included the trial transcripts). At oral argument, ODOT again raised its argument that this court should dismiss this appeal because Wilkes failed to file a proper notice of appeal. Specifically, ODOT argues that the notice of appeal is deficient because it identifies the appellant as "Patricia D. Wilkes," instead of the "Estate of Marquis Shawndell Byrd." We decide this argument, as well, in Wilkes' favor.

{¶ 16} As we stated above, the complaint asserts a claim for wrongful death. In relevant part, R.C. 2125.02(A) provides that, "a civil action for wrongful death shall be brought in the name of the personal representative of the decedent." Thus, "only the personal representative has the legal capacity to sue" for wrongful death. *Toledo Bar Assn. v. Rust*, 2010-Ohio-170, ¶ 28.

{¶ 17} Pursuant to App.R. 3(D), "[t]he notice of appeal shall specify the party or parties taking the appeal." ODOT erroneously contends that the Estate of Marquis Shawndell Byrd is the plaintiff in this action, not Wilkes. In fact, this wrongful death action was filed by "Patricia D. Wilkes, as Personal Representative of the Estate of Marquis Shawndell Byrd." (Capitalization adjusted.) (Compl. at 1.) The complaint alleges that the

Macomb County Probate Court, of Macomb County, Michigan, appointed Wilkes the personal representative of Byrd's estate on February 28, 2018.  As the personal representative of Byrd's estate, Wilkes is the proper party to bring this action and take this appeal.  Consequently, the notice of appeal accurately names Wilkes as the party taking the appeal.  We thus find no defect in the notice of appeal, and we deny ODOT's motion to dismiss.

{¶ 18} We caution ODOT that its argument verges on the frivolous.  Apparently, ODOT asserted it without confirming the identity of the plaintiff named in the complaint or conducting more than cursory legal research.  We urge ODOT to do better.

**B.  Wilkes' Assignment of Error – Wrongful Death Under a Negligence Theory**

{¶ 19}  By her only assignment of error, Wilkes argues that the Court of Claims erred in concluding that ODOT could not be liable in negligence for failing to protect Byrd from the harm resulting from a third party's criminal act.  We agree.

{¶ 20}  To recover for wrongful death under a theory of negligence, a plaintiff must prove (1) the existence of a duty owing to the plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death.  *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 2004-Ohio-2629, ¶ 14.  The duty element of negligence is a question of law for a court to determine.  *Wallace v. Ohio Dept. of Commerce*, 2002-Ohio-4210, ¶ 22.  Whether a duty is breached and whether the breach proximately caused injury are normally questions of fact to be decided by a jury, or by a court in a bench trial.  *Szerszen v. Summit Chase Condominiums*, 2010-Ohio-4518, ¶ 21 (10th Dist.).

{¶ 21}  " 'Duty, as used in Ohio tort law, refers to the relationship between the plaintiff [or decedent] and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff [or decedent].' "  *Wallace* at ¶ 23, quoting *Commerce* & *Industry Ins. Co. v. Toledo*, 45 Ohio St.3d 96, 98 (1989).  ODOT has a general duty to maintain its highways in a reasonably safe condition for the traveling public.  *Zavinski v. Ohio Dept. of Transp.*, 2019-Ohio-1735, ¶ 24 (10th Dist.); *Miller v. Ohio Dept. of Transp.*, 2014-Ohio-3738, ¶ 41 (10th Dist.).  ODOT, however, is not an insurer of safety on its highways.  *Zavinski* at ¶ 25; *Miller* at ¶ 42.

{¶ 22} Generally, under Ohio law, there is no duty to prevent a third person from causing harm to another, absent a special relationship between the parties. *Simpson v. Big Bear Stores Co.*, 73 Ohio St.3d 130, 133 (1995). As the Supreme Court of Ohio recognized:

> [T]here is no common-law duty to anticipate or foresee criminal activity. . . . Thus, the law usually does not require the prudent person to expect the criminal activity of others. As a result, the duty to protect against injury caused by third parties, which may be imposed where a special relationship exists, is expressed as an exception to the general rule of no liability.

*Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 45 Ohio St.3d 171, 174 (1989).

{¶ 23} The Supreme Court has addressed the existence of a special duty owed to a defendant in two cases where third parties caused damage by dropping objects from bridges under the plaintiff's control. In the first case, *Ruhlin Constr. Co.*, the defendant, Ruhlin Construction Company ("Ruhlin"), was refurbishing and repairing a bridge that passed over a building owned by the plaintiff, Federal Steel and Wire Corporation ("Federal"). While the bridge was undergoing repair, vandals accessed the job site and threw rebar and other construction materials on the buildings below. To deter the vandalism, Ruhlin hired after-hours security guards and erected a six-foot, chain-link, barbed-wire fence. Ruhlin, however, withdrew both of these protective measures when the job site closed for the winter months. While the job site was dormant, vandals again accessed the site and the objects they threw from the bridge broke over one thousand windows in Federal's building. Federal sued Ruhlin for negligence.

{¶ 24} The trial court found Ruhlin owed no special duty to Federal to prevent vandals from damaging Federal's building, but the court of appeals reversed. The court of appeals held that Ruhlin had a duty to undertake reasonable measures to prevent the vandalism of Federal's premises.

{¶ 25} Affirming the court of appeals, the Supreme Court of Ohio held that:

> If a person exercises control over real or personal property and such person is aware that the property is subject to repeated third-party vandalism, causing injury to or affecting parties off the controller's premises, then a special duty may arise, to those parties whose injuries are reasonably foreseeable, to take adequate measures under the circumstances to prevent future vandalism.

*Ruhlin Constr. Co.*, 45 Ohio St.3d at syllabus. Based on the facts and circumstances of the case, the court found that it was reasonably foreseeable for Ruhlin to expect the vandalism on the job site to affect Federal.

{¶ 26} The Supreme Court of Ohio applied the *Ruhlin Constr. Co.* holding in its second bridge case—*Semadeni v. Ohio Dept. of Transp.*, 75 Ohio St.3d 128 (1996). In that case, Pietro Semadeni was killed when a chunk of concrete crashed through the windshield of his vehicle and struck him on the head as he was driving on I-71 in Cincinnati. The concrete was dropped or thrown by an unidentified person from an overpass bridge. The executor of Semadeni's estate filed an action against ODOT, alleging that Semadeni's injuries and death were the direct and proximate result of ODOT's negligent failure to implement its decision to install protective fencing on the overpass.

{¶ 27} The trial court decided the case in ODOT's favor on two grounds (1) ODOT was not liable for the criminal misconduct of third parties and did not have a duty to provide protection against criminal misconduct, and (2) ODOT had discretionary immunity from liability. This court affirmed the trial court's judgment based on the second ground.

{¶ 28} On appeal, the Supreme Court of Ohio noted that ODOT had adopted a new policy ("Policy 1005.1") approximately five years before Semadeni died that addressed the installation of protective fencing on existing bridges. The purpose of the new policy, in part, was to discourage the throwing or dropping of objects from bridges onto lower roadways. ODOT was aware that incidents of debris being dropped from freeway bridges were occurring throughout Ohio. ODOT, however, failed to implement Policy 1005.1 before Semadeni's death.

{¶ 29} The Supreme Court concluded that:

> We find *Ruhlin* to be factually analogous to the case at bar. In light of ODOT's adoption of Policy 1005.1, and applying "the same rules of law applicable to suits between private parties" to the facts before us, we conclude that ODOT possessed a duty to foreseeable travelers such as Semadeni to take adequate measures to timely implement Policy 1005.1.[1]

---

[1] This passage quotes R.C. 2743.02(A)(1), which provides in relevant part, "[t]he state hereby waives its immunity from liability . . . and consents to be sued, and have its liability determined, in the court of claims . . . in accordance with the same rules of law applicable to suits between private parties."

*Semadeni*, 75 Ohio St.3d at 131.  In other words, given ODOT's awareness of vandalism, as shown by its adoption of a policy regarding it, the Supreme Court determined ODOT owed Semadeni a special duty to take adequate measures to prevent it, i.e., install protective fencing as required by Policy 1005.1.  Ultimately, the Supreme Court determined that "reasonable minds could only find that ODOT was negligent in failing to timely implement Policy 1005.1, and that its negligence was a proximate cause of Pietro Semadeni's death." *Id.* at 133.  The Supreme Court remanded the case to the Court of Claims for it to decide the amount of damages to award to Semadeni's estate.

{¶ 30} In the case at bar, the Court of Claims discussed and relied on only one of these two cases—*Ruhlin Constr. Co.*  Additionally, the Court of Claims based its no-duty determination on *Feichtner v. Ohio Dept. of Transp.*, 114 Ohio App.3d 346 (10th Dist. 1995), a case from this court decided after *Ruhlin Constr. Co.* but before *Semadeni*. *Feichtner* involved an automobile passenger struck and killed by an object thrown from a bridge.  There, we concluded ODOT owed the decedent no special duty because ODOT could not have reasonably foreseen the criminal actions of the person who threw the rock that killed the decedent.  We reached that conclusion because there were no complaints of objects being thrown from the bridge in question, even though ODOT may have known of complaints from throughout the state regarding objects being thrown from bridges onto highways. *Id.* at 358.

{¶ 31} Based on *Ruhlin Constr. Co.* and *Feichtner*, the Court of Claims found that no special duty existed in this case because Wilkes failed to produce any evidence that vandals had previously thrown or dropped objects from the Indiana Avenue bridge, the particular bridge at issue in this case.  In other words, because the Indiana Avenue bridge was not subject to repeated prior vandalism, ODOT could not reasonably foresee injury to motorists from objects thrown or dropped from the bridge.  Consequently, ODOT owed no special duty to motorists to take adequate measures to prevent future vandalism.

{¶ 32} We find the Court of Claims' analysis unpersuasive because it failed to consider *Semadeni*.  In *Semadeni*, the Supreme Court of Ohio determined that ODOT had a special duty to protect a motorist from the concrete slab a vandal cast from a bridge.  To find that a special duty existed, the Supreme Court relied on evidence that ODOT knew that vandalism on bridges was a state-wide problem, and ODOT had actually adopted a

protective-fencing policy with the express intent to alleviate the problem. The Supreme Court did not require evidence of a history of vandalism involving the particular bridge at issue.

{¶ 33} To the extent that *Semadeni* conflicts with *Feichtner*, *Semadeni*, as Supreme Court precedent decided after *Feichtner*, is the prevailing law. As an intermediate appellate court, we are bound to follow the decisions of the Supreme Court of Ohio. *White v. Sheridan*, 2022-Ohio-2418, ¶ 37 (10th Dist.).

{¶ 34} If a third party's criminal act is not foreseeable, then no special duty arises. *Semadeni* at 131; *Davis v. Hollins*, 2019-Ohio-1789, ¶ 8 (10th Dist.). "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984). Foreseeability usually depends on a defendant's knowledge. *Id.* Determining whether a criminal act is foreseeable requires consideration of the totality of circumstances, which must be "somewhat overwhelming" to create a duty. (Internal quotation marks deleted and citations omitted.) *Davis* at ¶ 8.

{¶ 35} At trial, to prove a reasonably prudent person in ODOT's position would foresee the throwing or dropping of objects from the Indiana Avenue bridge, Wilkes introduced into evidence ODOT's Bridge Design Manual and questioned ODOT witnesses about ODOT's fencing policy. Since July 2016, the Bridge Design Manual has provided that "[f]encing shall be installed on all bridges over vehicular traffic except as noted herein." (Pl.'s Ex. 30 at § 350.2.) The exceptions listed in the manual are relatively minimal. ODOT requires fencing when a bridge passes over an interstate, a US route, a state route, or a city route. In compliance with its fencing policy, ODOT installed vandal protective fencing on both sides of the Indiana Avenue bridge prior to removing the fencing on the north side during rehabilitation of the bridge.

{¶ 36} According to the Bridge Design Manual, the "primary purposes of protective fencing" include the discouragement of "throwing or dropping [] objects from bridges onto traffic below." *Id.* at § 305.1. The ODOT witnesses all agreed with that statement of purpose. Mark Mondora, an ODOT District 2 area engineer, testified that the purpose of vandal protective fencing is to protect roadways from "people [] dropping something off the bridge." (Tr. Vol. I at 85.) Nick Zenk, an ODOT on-site construction engineer, stated the

purpose of fencing is to "det[er] people from trying to drop or throw things off the bridge." (Tr. Vol. II at 190.)  Zenk agreed that the fencing on the Indiana Avenue bridge protected motorists on I-75.  Finally, David Slatzer, ODOT assistant director for transportation policy and chief engineer, testified that one of the reasons for fencing is to "protect whatever is down below." *Id.* at 225.

{¶ 37}  This evidence establishes that ODOT has determined that vandals throwing or dropping objects from bridges onto traffic is a common enough problem that it necessitates state intervention.  ODOT recognizes that, given the opportunity, people will throw or drop objects off bridges onto traffic, which endangers motorists.  Consequently, ODOT employs fencing on almost every bridge over vehicular traffic to prevent such vandalism.

{¶ 38}  Given these undisputed facts, a reasonably prudent person would foresee that vandals would use the removal of the protective fencing on the north side of the Indiana Avenue bridge to throw or drop objects onto I-75.  ODOT, therefore, owed a special duty to the motorists on I-75 to take adequate measures to prevent that vandalism.  That special duty extended to Byrd, a passenger in a vehicle traveling on I-75.

{¶ 39}  We next turn to the second element we must consider: whether ODOT breached its duty to Byrd.  ODOT had a duty "to take adequate measures under the circumstances to prevent future vandalism." *Ruhlin Constr. Co.*, 45 Ohio St.3d at syllabus.  ODOT thus had an obligation to take reasonable action to mitigate the risk of harm that arose when ODOT directed Kokosing to remove the protective fencing from the north side of the Indiana Avenue bridge.

{¶ 40}  ODOT understood that rehabilitation of the Indiana Avenue bridge left the bridge without vandal protection on the north side.  ODOT also knew that only a single lane of vehicular traffic and a line of 32-inch concrete barriers separated the south-side sidewalk from the north edge of the bridge.  ODOT engineer Mondora testified that pedestrians on the south side of the bridge could drop an object over the north edge of the bridge merely by crossing the street and "reach[ing] over a barrier wall."  (Tr. Vol. I at 87.)  ODOT, however, had "no concerns" about the absence of protective fencing on the north side of the bridge, so it did not instruct Kokosing to take any action to stop vandals from dropping or throwing objects from the north side of the bridge. *Id.* at 86.  Therefore, ODOT did not, for

example, direct Kokosing to hire law enforcement officers to monitor the bridge or install temporary fencing for the duration of the reconstruction project.

{¶ 41} ODOT argues that, to prove a breach, Wilkes had to produce evidence specifically identifying the protective measures ODOT needed to undertake. We disagree. To prove a breach, Wilkes had to show that ODOT failed "to take adequate measures under the circumstances to prevent future vandalism." *Ruhlin Constr. Co.* at syllabus. Wilkes accomplished this by proving that ODOT took no measures to prevent future vandalism. ODOT, therefore, breached its duty to Byrd.

{¶ 42} Finally, we must address the third element of a wrongful death action under a theory of negligence: whether Wilkes proved proximate causation between ODOT's breach of its duty and Byrd's death.

{¶ 43} If the injury sustained is the natural and probable consequence of the alleged negligent act, then that act is the proximate cause of the injury. *Sutowski v. Eli Lilly & Co.*, 82 Ohio St.3d 347, 351 (1998). To find that an injury was the natural and probable consequence of an alleged negligent act, it must appear that the injury complained of could have been foreseen or reasonably anticipated from the act. *Strother v. Hutchinson*, 67 Ohio St.2d 282, 287 (1981). "There may be more than one proximate cause of an injury." *Taylor v. Webster*, 12 Ohio St.2d 53, 57 (1967).

{¶ 44} Undeniably, the teenager's criminal act of throwing a sandbag over the side of the Indiana Avenue bridge was a proximate cause of Byrd's death. An additional proximate cause of Byrd's death was ODOT's failure to take any reasonable measures to prevent vandalism after the removal of the north-side protective fencing. As we concluded above, given the facts of this case, a reasonably prudent person would foresee the ramifications of the removal of the protective fencing: the dropping and throwing of objects from the Indiana Avenue bridge onto the traffic below. Therefore, a reasonably prudent person would also anticipate that taking no measures to prevent that vandalism would result in damage to persons and property from the projectiles launched from the bridge. Thus, Byrd's death was a natural and probable consequence of ODOT's negligence.

{¶ 45} Based on our review of the elements of Wilkes' claim, we conclude that the trial court erred in entering judgment for ODOT. Accordingly, we sustain Wilkes' assignment of error. Consistent with *Semadeni*, we must remand this case to the Court of

Claims so that it may determine the amount of damages to award Byrd's estate. *See Semadeni*, 75 Ohio St.3d at 133-34 (remanding for a determination of damages).

## C. ODOT's Conditional Cross-Assignment of Error – Discretionary Immunity

{¶ 46} Having sustained Wilkes' assignment of error, we turn to ODOT's conditional cross-assignment of error. ODOT assigns as error:

> The trial court erred in finding that the Ohio Department of Transportation was not entitled to discretionary immunity for its policy decision not to install temporary fencing during the demolition and replacement of a bridge over an interstate highway.

{¶ 47} By its conditional cross-assignment of error, ODOT argues that the trial court erred in not dismissing Wilkes' claim for lack of jurisdiction pursuant to the doctrine of discretionary immunity. We disagree.

{¶ 48} "Under the doctrine of sovereign immunity, 'a state is not subject to suit in its own courts unless it expressly consents to be sued.'" *Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 12, quoting *Proctor v. Kardassilaris*, 2007-Ohio-4838, ¶ 7. As amended in 1912, the Ohio Constitution permits "[s]uits [to] be brought against the state, in such courts and in such manner, as may be provided by law." Ohio Const., art. I, § 16. In 1975, the General Assembly enacted the Court of Claims Act, R.C. 2743.01 et seq., in which it waived sovereign immunity and consented to be sued and have its liability determined in the Court of Claims.

{¶ 49} In relevant part, R.C. 2743.02(A)(1) states, "The state hereby waives its immunity from liability . . . and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties." The Court of Claims "has exclusive, original jurisdiction of all civil actions against the state permitted by the waiver of immunity" in R.C. 2743.02. R.C. 2743.03(A)(1). Consequently, the Court of Claims' subject-matter jurisdiction is "tied to the scope of the state's waiver of immunity and consent to be sued in R.C. 2743.02." *Smith v. Ohio State Univ.*, 2024-Ohio-5887, ¶ 21 (10th Dist.).

{¶ 50} In addressing the meaning of R.C. 2743.02(A)(1), the Supreme Court of Ohio has determined that "the state's potential liability under R.C. Chapter 2743 is not unbounded." *Wallace*, 2002-Ohio-4210, at ¶ 34. According to the Supreme Court:

> The language in R.C. 2743.02 that "the state" shall "have its
> liability determined . . . in accordance with the same rules of
> law applicable to suits between private parties . . ." means that
> the state cannot be sued for its legislative or judicial functions
> or the exercise of an executive or planning function involving
> the making of a basic policy decision which is characterized by
> the exercise of a high degree of official judgment or discretion.

*Reynolds v. State*, 14 Ohio St.3d 68 (1984), paragraph one of the syllabus. Thus, the abrogation of sovereign immunity in R.C. 2743.02 does not extend to the essential acts of governmental decision-making. *Wallace* at ¶ 34. When the state is sued for making highly discretionary policy decisions pursuant to its legislative, judicial, executive, or planning functions, the Court of Claims lacks jurisdiction over the suit because the state has not waived its sovereign immunity for those decisions. *Smith*, 2024-Ohio-764, at ¶ 16; *accord Risner v. Ohio Dept. of Transp.*, 2015-Ohio-4443, ¶ 24 (holding that the state "is immune from any liability arising from the decisions made pursuant to its discretionary function"). This jurisdictional bar to suit against the state is known as discretionary immunity. *Smith*, 2024-Ohio-764, at ¶ 16. An appellate court reviews whether a trial court had subject-matter jurisdiction de novo. *Id.* at ¶ 11.

{¶ 51} In this case, ODOT too narrowly articulates the alleged decision it contends Wilkes seeks to hold it liable for making. ODOT claims Wilkes is suing it for not installing temporary fencing on the north side of the Indiana Avenue bridge during the renovation of the bridge. In actuality, Wilkes alleges ODOT is negligent for failing to take any action to prevent vandalism after the demolition of the north-side protective fencing.

{¶ 52} According to the evidence introduced at trial, ODOT did nothing to prevent vandalism because it did not recognize the removal of the north-side protective fencing as a concern that needed addressing. Discretionary immunity applies to basic policy decisions that are characterized by the exercise of a high degree of official judgment or discretion. *Reynolds* at paragraph one of the syllabus; *accord Young v. Univ. of Akron*, 2007-Ohio-4663, ¶ 18 (10th Dist.) (decision not entitled to discretionary immunity because it "was not a basic policy choice resulting from the exercise of judgment or discretion"). Here, ODOT did not make a discretionary policy decision to take no action; it took no action because it did not perceive a problem. We thus conclude that discretionary immunity does not apply in this case.

{¶ 53} In reaching this conclusion, we recognize that ODOT can make a discretionary policy decision to not undertake a particular action. *See Risner*, 2015-Ohio-4443, at ¶ 17 (holding discretionary immunity applied to ODOT's decision not to improve certain portions of an intersection). However, the evidence in this case demonstrates that ODOT did not make such a decision with regard to preventing vandalism on the Indiana Avenue bridge. Accordingly, we overrule ODOT's conditional cross-assignment of error.

## V. CONCLUSION

{¶ 54} For the foregoing reasons, we sustain Wilkes' sole assignment of error, and we overrule ODOT's conditional cross-assignment of error. We reverse the judgment of the Court of Claims of Ohio, and we remand this case for further proceedings consistent with law and this decision. Additionally, we deny ODOT's motion to dismiss.

*Judgment reversed*;
*cause remanded*;
*motion to dismiss denied.*

DORRIAN, J., concurs.
BOGGS, J., concurs in judgment only.
_____